**Mary Patricia TAYLOR, Petitioner–Appellant,**

v.

**Don DAWSON, Jailer, Lincoln County Jail, Respondent–Appellee.**

No. 87–6290.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 30, 1988.

Decided Nov. 6, 1989.

Rodney McDaniel, argued, Asst. Public Advocate, Frankfort, Ky., for petitioner-appellant.

Frederic Cowen, Atty. Gen., of Kentucky, Frankfort, Ky., David Martin, Gregory C. Fuchs, Asst. Atty. Gen., argued, for respondent-appellee.

Before WELLFORD and NELSON, Circuit Judges, and McQUADE, District Judge.[*]

DAVID A. NELSON, Circuit Judge.

Where a criminal proceeding is terminated by the declaration of a mistrial to which the defendant did not consent and for which there was no "manifest necessity," the Double Jeopardy Clause of the Fifth Amendment bars retrial of the defendant for the same offense. See *United States v. Jorn,* 400 U.S. 470, 481, 91 S.Ct. 547, 555, 27 L.Ed.2d 543 (1971) (plurality opinion), quoting *United States v. Perez,*

---

* The Honorable Richard B. McQuade, Jr., United States District Judge for the Northern District of Ohio, sat by designation and heard oral argument, but resigned his office before this case was decided.

22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). The principles of the Double Jeopardy Clause have been made applicable to the states through the Fourteenth Amendment, see *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), so the rule applies in both federal and state proceedings.

The case at bar arises out of a retrial of appellant Mary Patricia Taylor in a Kentucky court on a charge of manslaughter. The retrial was initiated over Ms. Taylor's objection after an earlier prosecution had been cut short by the granting of a mistrial at the instance of the prosecutor. Ms. Taylor was eventually found guilty and was sentenced to imprisonment for 15 years. After exhausting her rights of appeal in the state courts, she sought a writ of habeas corpus from the United States District Court for the Western District of Kentucky. Ms. Taylor contended that there had been no manifest necessity for the Kentucky trial court to declare a mistrial, and that the Commonwealth had therefore violated the double jeopardy prohibition when it placed her on trial again.

The habeas court denied Ms. Taylor's petition, concluding that the trial court's declaration of a mistrial had not been beyond the pale, as it were. Notwithstanding the broad discretion accorded trial judges in such matters, we disagree. The trial record, as we read it, does not manifest the kind of "necessity" for a mistrial that would make a retrial permissible; we shall therefore direct that a writ of habeas corpus be issued.

## I

Mary Patricia Taylor, a divorced woman with two teenaged children, had a boyfriend named Timothy Culver. Mr. Culver was involved not only with Ms. Taylor, but with a young woman named Darby Dugan. On a Monday morning in July of 1981, Ms. Taylor came home unexpectedly and found Mr. Culver and Ms. Dugan asleep in bed together. Ms. Taylor grabbed Ms. Dugan by the hair, as the latter subsequently testified, and told her—without waking Mr. Culver—"Get out of my house." Ms. Du-

gan testified that Ms. Taylor also said "You're dead. You're both dead. I'll kill you both." Ms. Taylor admitted having told Ms. Dugan to get out of the house, but denied threatening to kill anyone.

On Saturday of the following week, Ms. Taylor took a .25 caliber pistol and shot Mr. Culver dead. Five bullets were found in Mr. Culver's body; the entry paths indicated he had been shot from behind.

After the shooting, Ms. Taylor ran to the house of a neighbor, a priest, and asked him to call the police. The local sheriff responded to the call and took Ms. Taylor into custody. A Kentucky state police officer who subsequently joined in the investigation observed that Ms. Taylor had bruises around her eyes and on both arms. She also complained of pain in her ribs, two of which were subsequently found to have been broken. Mr. Culver had beaten her up a day or two earlier, Ms. Taylor was to testify at her final trial, and he had beaten her repeatedly in the past.

In an encounter immediately before the shooting, Mr. Culver (who, like Ms. Taylor, had been injecting cocaine into his veins), allegedly threatened to "knock all [her] teeth down [her] damn throat" and kill her. Mr. Culver had a .45 caliber pistol close at hand, and Ms. Taylor was aware of the fact that a month or so earlier Mr. Culver had broken the jaw of a friend of hers named Doug Hill. "I shot Timmy Culver," Ms. Taylor maintained, "because I was afraid he was going to kill me."

## II

Ms. Taylor was placed on trial a total of three times. At her first trial, in 1982, the jury acquitted her of murder but found her guilty of manslaughter in the first-degree. The Kentucky Court of Appeals reversed the conviction on the ground that Ms. Taylor's credibility had been improperly impeached with evidence of a misdemeanor conviction. The case was remanded for a new trial.

It was the second trial, conducted in July of 1983, that ended in a mistrial. The

events that led up to the declaration of a mistrial may be summarized as follows.

In proceedings conducted in the judge's chambers before the jury was impaneled, counsel for defendant Taylor suggested that the same reasoning which precluded mention of Ms. Taylor's misdemeanor conviction ought to rule out mention of her past drug use. The trial judge told the prosecutor not to go into that in his opening statement or in his case in chief, leaving open the possibility that it might be used on rebuttal. The prosecutor then moved that defendant Taylor and her counsel be instructed not to mention prior bad acts of the decedent, Tim Culver. During the first trial, the prosecutor went on to explain, defense counsel had disclosed to the jury that

> "Tim Culver beat the defendant on several occasions over a long period and that Tim Culver used drugs on several occasions during a long period, that Tim Culver had a prior felony conviction and was on parole from prison at the time defendant killed him, and Tim Culver tore up her house several months before the defendant killed him, that Tim Culver chased the defendant at speeds approaching 100 miles an hour through Bardstown and Springfield and rammed her car from behind a week before she killed him, that Tim Culver severely beat the defendant, blackened her eye, put bruises on her arms, hurt her wrist, knocked her down and kicked her in the ribs two days before she killed him."

The basis for the prosecutor's limiting motion was a decision handed down by the Kentucky Supreme Court a month earlier in *Thompson v. Commonwealth*, 652 S.W.2d 78 (1983). The defendant in *Thompson* had shot and killed a man in the course of attempting to break up a fight outside a bar. The trial court admitted evidence of the victim's prior criminal convictions on the theory that it went to the question of who the aggressor was. The defendant, it appears, "was unaware of the victim's reputation for violence...." *Id.* at 82 (dissenting opinion of Rouse, J.) The Court of Appeals, in an opinion adopted by the Supreme Court, declared that evidence

of prior specific acts could not be shown to establish the victim's character for violence or aggression; "[s]uch can only be proved by evidence of the individual's reputation in the community not by personal opinion, nor by specific acts of conduct." *Id.* at 80. Relying on that case, the prosecutor asked that defendant Taylor's counsel be restricted to proving Tim Culver's bad character by showing his reputation in the community, and not by specific bad acts.

The trial judge asked if it had come out in the prior trial that Mr. Culver had been convicted of a felony. When told that such a conviction had been mentioned, the judge said (if the court reporter got it right) "Let's not get into statement now as to prior violent acts and incidents of the decedent." The judge expressed agreement with the argument that such acts might be relevant to show defendant Taylor's state of mind, but seemed inclined initially to think that only threats and acts of violence directed at Ms. Taylor herself would be relevant.

Citing *Carnes v. Commonwealth*, 453 S.W.2d 595 (Ky.1970), where the court held it was prejudicial error to exclude evidence of angry and profane remarks that the decedent had directed at someone other than the defendant, but which had been communicated to the defendant, Ms. Taylor's counsel went on to argue that acts of violence towards others—Doug Hill, *e.g.*— would also have a bearing on the defendant's state of mind if she knew of such acts. "Evidence of the mental attitude of the accused is germane to the issue of self defense." *Carnes*, 453 S.W.2d at 598. As to the decedent's heavy use of drugs, counsel argued, "[i]t [also] affects her state of mind, because it explains [his] irrational behavior."

The prosecutor tried to fall back on *Thompson*, but the judge cut him off peremptorily: "You can make your objection at the time the defense introduces any evidence like that," the court ruled. Defense counsel was then told not to go into the decedent's use of drugs on opening statement, and not to mention parole. Defense

counsel asked if the court was saying "Let's not mention it until you see how it develops at trial? You will rule at a specific point?" "That's correct," the judge replied.

With these ground rules having been established, defense counsel made an opening statement to the jury in which he described a pattern of abuse and beatings to which defendant Taylor had been subjected by the decedent, Tim Culver. Counsel made one brief reference to the fact that Culver's bad behavior seemed to be related to drug use, but the prosecutor offered no objection at that point. Defense counsel went on to say that the beatings got more severe, and although the defendant made attempts to flee, she was not quite able to sever the relationship. Counsel told the jury that a psychiatrist would take the stand to explain the not uncommon syndrome in which a woman is beaten and then for some reason comes back to be beaten again.[1] Defendant Taylor's children left home, counsel said, because they could not stand the violence; Ms. Taylor's young son moved out after "he saw the decedent strike another man so viciously that it caused him to be sick."

Here the prosecutor objected, and the trial judge told the jury to disregard the statement as to the decedent striking someone else. Defense counsel then referred to several threats and acts of violence against the defendant herself, including an incident in which the decedent rammed into the back of her car and the beating in which her ribs were broken. That beating, counsel said, left her "in a state of total mental impairment." To relieve her pain, Tim Culver began giving her injections of cocaine. The prosecutor interposed a second objection at this point, but the court overruled it.

Coming to the time of the shooting, defense counsel told the jury that Tim Culver "threatens he is going to kill her. He is going to beat her, just like he has beaten others that she knows about." Again the prosecutor objected. Again the objection was overruled.

There were no further objections in the course of the defendant's opening statement. Taken as a whole, the opening statement was quite unexceptionable.

As part of its case in chief, the prosecution had Darby Dugan, the other girlfriend, testify about her relationship with Tim Culver and about defendant Taylor's reaction on finding the two of them in bed together. On cross-examination, defense counsel asked Ms. Dugan about violence between her and Tim Culver. The prosecutor objected. After an unreported bench conference, witness Dugan was allowed to testify about an occasion on which she "smacked him upside the head, and as a normal reflex for anyone, he smacked me back." Again the prosecutor objected. Again the objection was overruled.

When the prosecution rested its case, defendant Taylor took the stand on her own behalf. She explained how she met Tim Culver in October of 1980; how she began seeing him almost every day; how he offered to help her financially; how he moved some of his clothing into her house; how he went away for a time and told her on his return that "he had been up in Lexington with friends and he had been doing this drug called crank;" how he became abusive and acted abnormally in various ways; how he cursed Ms. Taylor's daughter and threatened to hit her; and how Ms. Taylor returned home one night and "found Doug Hill in my den. He had been beaten up by Timmy. And my son had been...."

The prosecutor objected at this point— his first objection during defendant Tay-

1. For discussion of the battered woman syndrome and the increasing incidence of reference to it in cases where women kill abusive husbands or boyfriends, see C. Ewing, *Battered Women Who Kill: Psychological Self–Defense as Legal Justification* (1987); Vaughn & Moore, *The Battered Spouse Defense in Kentucky*, 10 N.Ky.L.Rev. 399 (1983); Schneider, *Equal Rights to Trial for Women: Sex Bias in the Law of Self–Defense*, 15 Harv.C.R.–C.L.L.Rev. 623 (1980); Note, *Defense Strategies for Battered Women Who Assault Their Mates: State v. Curry*, 4 Harv.Women's L.J. 161 (1981); Note, *The Battered Woman Syndrome and Self Defense: A Legal and Empirical Dissent*, 72 Va.L.Rev. 619 (1986).

lor's testimony. The objection was sustained.

Ms. Taylor went on to relate how Timmy Culver had thrown a crockery pitcher past her head; how he had thrown a paint can at her den wall; how he first struck her in January of 1981; how he threatened to attack her parents' house with a shotgun if she did not get him money; how he threatened to kill her former husband and the two children; how he slapped her while wearing a gold ring; how he threw her against a bedroom wall; and how on one occasion he told her he would leave her alone if she would drive him to his grandmother's. Defendant Taylor was asked to describe her physical condition on that particular occasion, and the following testimony ensued:

"A. I was beaten up. I had knots all over my head; I had bruised eyes, and I had swollen lips and I had loose teeth.

Q. Was there anybody who observed your condition?

A. Yes, sir.

Q. Would you please say who—who observed your condition?

A. Austin Weller and Gary Boone of the Nelson County Sheriff's Department.

Q. What was their occasion to observe you?

A. I was in the den laying on my couch Saturday afternoon and Austin Weller and Gary Boone came into my home. I was asleep, and when I woke up, Austin was holding a gun on me, asking me if Timmy Culver was in the house, and I told him I didn't know. And he told me that he had escaped from—"

At this point the prosecutor interposed another objection—his second objection during defendant Taylor's testimony. The court sustained the objection. The prosecutor then asked to approach the bench, and in an unreported bench conference moved for a mistrial.

At the conclusion of the bench conference the trial court made the following statement to the jury—a statement that strikes us as almost inexplicable in light of what the court had said in chambers about ruling during the course of the trial itself on objections to testimony concerning Tim Culver's parole status:

"Ladies and gentlemen of the jury, the court has admonished counsel for both sides that during the trial of this case, there should be no evidence of any prior criminal acts of either of the parties involved. Constantly, this ruling of the court has been violated. The court has admonished counsel to advise witnesses not to do so. These statements cannot be erased from the minds of the jury, although I have admonished you. The effect of admonishment actually just implants it further in your mind. I hate to do it, we have spent all day here today. The Commonwealth has made a motion for a mistrial, and the court has sustained the motion for a mistrial and case will be reset for trial at a later date. As I say, I'm sorry to have to do this, but, obviously, what has occurred can not be erased from your mind, even though I might tell you that you are not to consider it. At this time, then, the court will take the case from the jury, declare a mistrial and it will be reset for a later date. You are now finally excused for the day, and I appreciate your presence here today. I am sorry the day has been wasted for you all, and for the court, and for witnesses, but in the interest of justice, the court does feel that a mistrial must be declared. At this time, you all may be finally excused, and thank you for being here." (Transcript, pages 144–45.)

After the trial had been aborted in this fashion, defendant Taylor moved for dismissal of the indictment on the ground that a new trial would constitute double jeopardy. The motion was briefed, and the court was given a trial transcript—a transcript which, the court noted in an opinion denying the motion, omitted "bench conferences which the Court thought were being taken down by the reporter, [but which] were not transcribed." (The court did not say what had occurred in any bench conference prior

to the one in which the mistrial was declared.)

The denial of the motion for dismissal of the indictment was justified by the trial court on the following grounds:

"Prior to the commencement of the last trial, counsel were instructed to omit references to any prior crimes of the Defendant and decedent and specific violent acts of the decedent except as they might have been directed toward the Defendant. Counsel were admonished likewise to advise their witnesses of the Court's ruling.

Despite the Court's ruling, numerous references were made to violent acts of the decedent other than those directed toward the Defendant herself. The straw that finally broke the camel's back was the unsolicited answer of the Defendant with regard to the decedent having escaped. It was at this time that the Court sustained a motion for a mistrial made by the Commonwealth and the reasons for doing so are stated in the transcript at page 144.

Certainly a defendant should not be permitted to invoke the Constitutional guarantee against double jeopardy when, through her own misconduct, she has caused a mistrial to be had and the swearing of the jury set aside."

If counsel had been instructed prior to the commencement of trial not to let witnesses testify to specific acts of violence not directed toward the defendant but known to her, the instruction would have been inconsistent with Kentucky law. See *Carnes, supra,* and the cases cited therein, including *Fannon v. Commonwealth,* 295 Ky. 817, 175 S.W.2d 531 (1943) (conviction of wife for killing her husband reversed because of exclusion of evidence of husband's known "bestial conduct" with another woman). But the trial court's suggestion that such an instruction had in fact been given is flatly inconsistent with the transcript of the conference in chambers: instead of granting the prosecutor's motion *in limine,* as we have seen, the court told the prosecutor he could object as the evidence came in, with the court ruling when it was seen how the evidence developed.

At only two points in the trial did the prosecutor object to evidence of specific acts of violence directed at anyone other than defendant Taylor. The first objection dealt with Darby Dugan's testimony that Tim Culver "smacked" her—and that objection, of course, was *overruled.* The second objection came when Ms. Taylor testified that she found Doug Hill in her den after he had been beaten up by Culver. After the court sustained the latter objection (erroneously, as we believe), there was no further testimony about actual violence against anyone other than defendant Taylor herself. The notion that the defense was somehow guilty of "misconduct" in this respect is simply preposterous.

The case was retried in May of 1984. The new trial judge stated at the outset that he was going to allow the defendant to introduce prior acts of which she had knowledge: "I clearly think they are admissible after reading the cases." We are told that the Commonwealth made no attempt to exclude the evidence that had led to the earlier mistrial, and the evidence all came in. Ms. Taylor was convicted of manslaughter nonetheless.

### III

Following her conviction at the third trial, Ms. Taylor perfected an appeal to the Kentucky Court of Appeals. In a unanimous decision, the Court of Appeals reversed the conviction on double jeopardy grounds.

After analyzing the transcript of the second trial in some detail, the Court of Appeals explained that there is a difference between offering proof of a victim's character to show that he was the likely aggressor (*cf. Thompson,* the case cited by the prosecutor in support of his motion *in limine* ), and offering proof of prior bad acts, known to the defendant, for the purpose of establishing the defendant's own state of mind. Although evidence of specific acts is not admissible to prove character, the Court of Appeals said, "[a] different rule is imposed in proving a defendant's

state of mind." The court continued as follows:

"It may be fairly stated that any evidence is admissible if it tends to affect one's mental state at the time in question. This includes evidence of a victim's specific bad acts directed toward a defendant or others if known to the defendant, *Cessna v. Commonwealth*, Ky., 465 S.W.2d 283 (1971); *Carnes v. Commonwealth*, Ky., 453 S.W.2d 595 (1970); *Fannon v. Commonwealth*, Ky., 175 S.W.2d 531 (1943); as well as information concerning drug usage or escape from custody. The only proviso concerning receipt of information about a victim which may have a bearing on a defendant's state of mind is that a defendant must be aware of same; it must have been theretofore communicated to him. *See Wooten v. Commonwealth*, Ky., 478 S.W.2d 701 (1972), and *Fannon, supra*. Such is obviously true because unknown facts pertaining to a victim, however heinous, could not possibly affect a defendant's state of mind."

Against this background, it was clear to the Court of Appeals that:

"The record clearly demonstrates that during the second trial, defense counsel was attempting to show matters concerning Culver of which Mary [Taylor] had knowledge and which impacted upon her state of mind. The record does not suggest defense counsel was attempting to use specific bad acts to establish Culver's general community reputation. Further, the trial court believed that only evidence of Culver's prior specific bad acts directed toward Mary could be offered as evidence. This was an erroneous interpretation of the rules set forth in *Carnes, supra, Fannon, supra*, and *Cessna, supra*. Defense counsel stated in pretrial hearing that he was offering the evidence in question to show its impact upon Mary's mental status. The *Fannon* line of cases makes it clear that evidence of specific bad acts is relevant and admissible to prove a defendant's state of mind provided defendant has prior knowledge of same. Therefore, under the multiple admissibility rule, evidence of specific bad acts may not be excluded simply because it is inadmissible in proving a victim's character under a different rule of evidence. *See Lawson, Kentucky Evidence Law Handbook*, 1.10 (1979); [Fed.R.Evid.] 404(b). Thus, it is clear that the alleged errors upon which the trial court's mistrial order was based were not errors at all. The granting of the mistrial was mistaken and in no way attributable to Mary."

Because the granting of the mistrial was "mistaken" and in no way attributable to Mary Taylor, the Court of Appeals held that a retrial was barred by Ky.Rev.Stat. 505.030(4)(b).[2] "No manifest necessity warranting a mistrial existed at Mary's second trial," the Court of Appeals concluded.

The Commonwealth appealed to the Supreme Court of Kentucky. In a short memorandum opinion from which two justices dissented, that court reversed the decision of the Court of Appeals. "Ordinarily," the Supreme Court said, "testimony regarding specific acts of violence toward others and known by Taylor [would be] admissible to show a state of mind justifying a plea of self-defense."[3] The Supreme Court went on to say, however, that

---

**2.** Ky.Rev.Stat. 505.030, a statute adopting the "manifest necessity" standard, provides in pertinent part as follows:

"When a prosecution is for a violation of the same statutory provision and is based upon the same facts as a former prosecution, it is barred by the former prosecution under the following circumstances:

\* \* \* \* \* \*

(4) The former prosecution was improperly terminated after the first witness was sworn but before findings were rendered by a trier of fact. Termination under either of the following circumstances is not improper:

(a) The defendant expressly consents to the termination or by motion for mistrial or in some other manner waives his right to object to the termination; or

(b) The trial court, in exercise of its discretion, finds that the termination is manifestly necessary."

**3.** *Accord*, Wigmore on Evidence, § 248, p. 68 (1979 ed.) ("On the whole, the state of the law has come to favor the admissibility of such facts").

"[h]ere, Taylor portrayed several brutal acts of violence by the deceased against her. At some point, the added testimony of other specific acts of violence and threats towards others rises above just showing the state of mind of Taylor and tends to unfairly prejudice the prosecution by getting the idea across to the jury that the deceased deserved to be killed."

Concluding, in effect, that it was within the trial court's discretion to find that Ms. Taylor's testimony was calculated to prejudice the jury unfairly, the Supreme Court held that the policy of deference to the trial court enunciated in *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), compelled the conclusion that the trial court was entitled to find that a mistrial was "manifestly necessary."

In April of 1987 Ms. Taylor petitioned the federal district court for a writ of habeas corpus. The case was referred to a magistrate, who filed a comprehensive report recommending dismissal of the petition. The magistrate emphasized that trial courts are vested with broad discretion in respect of mistrials; that each such case must be decided on its own facts; and that even if the trial court erred in this instance, the court's action was "a rational determination designed to implement a legitimate state policy with no suggestion that the implementation of that policy in this manner could be manipulated so as to prejudice the defendant." *Illinois v. Somerville*, 410 U.S. 458, 469, 93 S.Ct. 1066, 1073, 35 L.Ed.2d 425 (1973).

The district court accepted the magistrate's report, with certain modifications. Perhaps the most significant of these was a finding, based on the district court's reading of the trial transcript, that "[t]he trial court ruled that only the decedent's prior specific bad acts towards the defendant could be admitted into evidence and that objections concerning the decedent's drug involvement could be made at the time it was offered into evidence." (Our own reading is that the trial judge gave counsel to understand that after the opening statements were out of the way, objections to

evidence of the decedent's prison record, parole status, drug use, and other bad acts would all be ruled on as matters unfolded at trial. But even if this is not what the trial judge intended, his remarks could reasonably have been interpreted that way by defense counsel.)

The district court said that defense counsel "repeatedly violated" the trial court's supposed decision that only bad acts directed at the defendant could be admitted into evidence. As indicated above, however, we were unable to find any such repeated violations.

With respect to the standard by which the double jeopardy effect of a mistrial is to be determined, the district court concluded, correctly, that the relevant question was whether the prosecution had demonstrated a "manifest necessity" for the mistrial. *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). The district court found that the manifest necessity standard had been met, and therefore denied the petition for a writ of habeas corpus. This appeal followed.

## IV

■ *Arizona v. Washington* was a habeas case that arose from an Arizona trial court's declaration of a mistrial after the defendant's counsel told the jury on opening statement that the prosecutor had suppressed evidence at an earlier trial of the case, leading the Supreme Court of Arizona to grant the defendant a new trial. Although given ample time to research the issue, defense counsel was unable to produce any support for his contention that evidence of the Supreme Court's ruling would be admissible on retrial. The state trial court held that such evidence would not be admissible. The United States Supreme Court had no reason to disagree with that conclusion; speaking through Justice Stevens, the Court noted that "[w]e ... start with the premise that defense counsel's comment was improper and may have affected the impartiality of the jury." 434 U.S. at 511, 98 S.Ct. at 833. Starting from that premise, and giving appropriate deference to the trial court's finding that

the improper comments were prejudicial, the Supreme Court concluded that "the mistrial order [was] supported by the 'high degree' of necessity which is required in a case of this kind." *Id.* at 516, 98 S.Ct. at 835 (footnote omitted).

In the case at bar, by contrast, we do not start from the premise that evidence of the decedent's prior bad acts, known to the defendant, was inadmissible to show the defendant's state of mind. On the contrary, we start from the premise that such evidence ordinarily *is* admissible. We know that it is ordinarily admissible, under Kentucky law, because the Supreme Court of Kentucky expressly said so in Ms. Taylor's own case. And before the case reached the state supreme court, as we have seen, the Kentucky Court of Appeals, analyzing Kentucky caselaw going back over 40 years, explained in detail why evidence of known "bad acts" is admissible, where offered to prove the defendant's state of mind, and why the prosecutor's reliance on *Thompson v. Commonwealth* had been misplaced.

Had the trial court made a definitive ruling, at the start of Ms. Taylor's trial, that under no circumstances could the defense offer evidence of any misconduct by the decedent not directed against Ms. Taylor herself, such a ruling would have been clearly erroneous. But that is not what happened. The court never granted the prosecutor's motion *in limine.* When the prosecutor tried to fall back on *Thompson v. Commonwealth,* in the course of a discussion of the decedent's involvement with drugs, the court cut him off with the statement "[y]ou can make your objection at the time the defense counsel introduces any evidence like that. . . ." And in the context of a discussion of the decedent's prison record and parole status, the trial court expressly reaffirmed, in response to a question by defense counsel, that the court would rule in the light of developments during the trial itself.

This approach obviously made sense. If, as the Kentucky Supreme Court was subsequently to hold, cumulative evidence of threats and violence towards persons other than Ms. Taylor could prejudice the prosecution unfairly "at some point," even though such evidence would ordinarily be admissible, it would be logical to see how things developed at trial before deciding precisely when the point of inadmissibility was likely to be reached.

The trial court obviously did not think that the critical point had been reached when the other girlfriend, Darby Dugan, was asked about violence between Tim Culver and herself, because the court allowed Ms. Dugan to testify that Culver "smacked" her. Similarly, the court allowed defense counsel to tell the jury, in opening statement, that Culver threatened to kill Ms. Taylor and threatened to beat her, "just like he has beaten others that she knows about." An objection to this statement, it will be recalled, was overruled. Without objection, moreover, Ms. Taylor was permitted to testify to threats of harm made by Culver against several members of her immediate family.

If the trial court thought that the testimony about Mr. Culver's bad acts was reaching the point where it might unfairly prejudice the prosecution, it was up to the court to make that determination known to defense counsel. Fundamental fairness required nothing less—for otherwise, counsel would have no way of knowing that further testimony along this line might result in a mistrial.

After the fact, the trial court said that Ms. Taylor's unsolicited testimony about Culver having "escaped"—from custody, presumably—was the "straw that finally broke the camel's back." But the record gives no indication that defense counsel had been warned the camel's back was in danger of breaking. Ms. Taylor's cryptic and incomplete reference to Culver's having escaped marked the first and only time in the trial when the jury heard any suggestion that Culver had been convicted of a crime, or that he had been sent to prison, or that he had been placed on parole, or that he had escaped. Counsel had been told not to mention the subject of parole during opening statement, but the court had clearly deferred a ruling on the admis-

sibility of testimony on this subject pending developments at trial. No such ruling had been made, as far as the record discloses, before the court declared a mistrial.

Against this background, the trial court's precipitous declaration of a mistrial can fairly be characterized as "erratic"—the adjective that Justice Rehnquist used in *Illinois v. Somerville*, 410 U.S. at 469, 93 S.Ct. at 1073, to describe the out-of-the-blue-mistrial ruling involved in *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). In *Jorn*, as Justice Stevens suggested in *Arizona v. Washington*, 434 U.S. at 514, 98 S.Ct. at 834, the trial court was acting "irresponsibly," if not "irrationally," in declaring a mistrial. Neither of these terms seems too strong to describe the action taken by the trial court here. One cannot read the transcript of Ms. Taylor's aborted trial without experiencing a sense of amazement when, without any apparent warning at all, the trial court suddenly declares a mistrial because the jury has heard a snatch of testimony which, as we know from the subsequent opinions of Kentucky's appellate courts, would ordinarily be *admissible*.

A criminal defendant has a valued and important right to have his trial concluded by the tribunal before which it was begun. *Arizona v. Washington*, 434 U.S. at 505, 98 S.Ct. at 830. That right is sometimes subordinate to the public interest in having the prosecutor's evidence heard by an impartial jury, but to avoid the double jeopardy bar, the prosecutor must sustain the heavy burden of demonstrating "manifest necessity" for any mistrial declared over the defendant's objections. *Id.* The standard cannot be applied mechanically, and the necessity need not be absolute; a "high degree" of necessity will suffice. *Id.* at 506, 98 S.Ct. at 830. The trial court must be accorded "broad discretion," moreover, in deciding whether a continuation of the trial would defeat "the ends of public justice." *Illinois v. Somerville*, 410 U.S. at 459, 93 S.Ct. at 1068, quoting *United States v. Perez*, 9 Wheat. at 580. A reviewing court must scrutinize each case on its own facts, mindful that it is the trial judge who is best situated to make an intelligent decision on these matters. *Somerville*, 410 U.S. at 462, 93 S.Ct. at 1069, citing *Gori v. United States*, 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961); *Jones v. Hogg*, 732 F.2d 53, 55 (6th Cir.1984).

Taking all this into account, and giving due recognition to the fact that the transcript of Ms. Taylor's trial may leave something to be desired, we are not satisfied that the record in this case reflects the kind of "necessity" for a mistrial that is required, under the Constitution, before the plea of double jeopardy may be rejected. The judgment of the district court is therefore REVERSED, and the case is REMANDED with instructions to issue the writ of habeas corpus.