J-A25026-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                                :            PENNSYLVANIA
                                                  :
             v.                                :
                                                :
                                                  :
MANECA PRESSLEY                         :
                                                   :
             Appellant                     :       No. 49 WDA 2023

Appeal from the Order Entered January 3, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0009187-2019

BEFORE:    BOWES, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:           **FILED: DECEMBER 6, 2023**

Maneca Pressley appeals from the order denying her motion to dismiss for double jeopardy.  We reverse the order and discharge Pressley.

On June 21, 2019, Pressley's boyfriend Gerald Walker died during an encounter with Pressley.  Police charged Pressley with criminal homicide and possessing an instrument of crime.[1]  The charges were held for court.

Pressley and the Commonwealth procured expert witnesses to testify about Battered Woman Syndrome (BWS).  Pressley participated in interviews with Dr. Alice Applegate (for the defense) and Dr. Bruce Wright (for the prosecution).  Pressley filed a notice of her intent to offer testimony from Dr. Applegate, including how BWS issues "affected Ms. Pressley's mental state at

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2501(a), 907(a), respectively.

the time of the incident." Rule 568 Notice, 10/19/21, at 2. Before trial, the trial court directed counsel that their experts "were not permitted to testify to the ultimate issue of the case and not to impinge on the jury's ultimate fact-finding ability." Trial Court Opinion, 3/29/23, at 5.[2]

The case proceeded to a jury trial beginning on April 25, 2022. Pressley testified on her own behalf. She described escalating incidents of Walker physically abusing her. N.T., Trial, 4/25/22–4/28/22, at 342–54. Pressley testified that on the day of the incident, she told Walker that she wanted to end their relationship; he refused to leave the apartment and would not let her leave, either. *Id.* at 369–71. As Pressley tried to leave, Walker hit her, kicked her, pulled her hair, and pinned her on the bed. *Id.* at 371–76. Pressley testified that this was the first instance of abuse that made her fear for her life. *Id.* at 376. Ultimately, Pressley got to the kitchen, got a knife, swung it at Walker, and hit him in the neck. *Id.* at 378. Pressley testified that she called 911 and tried to stop Walker's bleeding. *Id.* at 379–80.

Pressley called Dr. Applegate to testify on the fourth day of trial. The Commonwealth stipulated to Dr. Applegate's expertise in psychology. *Id.* at 454–55. Dr. Applegate listed the materials she reviewed in reaching her conclusions: her own six-hour clinical evaluation of Pressley, Pressley's legal

---

[2] Notably, this direction for the attorneys to prepare their experts does not appear as a written order or in the notes of testimony. However, the parties do not dispute that the trial court addressed this matter. We accept for purposes of analysis that counsel understood that their expert witnesses were not permitted to testify to the ultimate issue of the case or to impinge on the jury's ultimate fact-finding ability.

records and mental health records, and about 16 pieces of research and literature. *Id.* at 455–57. Pressley then extensively asked Dr. Applegate about the literature she reviewed, until the Commonwealth objected. *Id.* at 457–65.

> [The Assistant District Attorney (ADA)]: Judge, I have to object to this line of questioning at this time. I was of the opinion that Dr. Applegate was going to testify about whether there was Battered Wife Syndrome in this case and how it applies to this case. Are we going to just go through hours of education on Battered Wife Syndrome? Can't she incorporate this into why it's relevant to this incident[?]
>
> THE COURT: Well, I think generally some education as to what it is, I wouldn't want to go into obviously a treatise of the condition.
>
> [Defense counsel]: We were just moving on.
>
> THE COURT: Greatly appreciated.
>
> [The ADA]: Thank you.
>
> [Defense counsel]: We were just moving on from battered woman to talk about trauma now. We will move quickly.
>
> THE COURT: Again, I would imagine this can be volumes and volumes and volumes of information that would probably take months and months. Can we restrain it to the applicability to this case, to the extent that it would again inform and educate the jury in their assessment of this case I would appreciate it.
>
> [Defense counsel]: Yes, Your Honor.

*Id.* at 465–66.

Pressley then questioned Dr. Applegate about how literature on trauma helped her form an opinion about Pressley:

> Q     Dr. Applegate, did your review of literature related to trauma help you perform your evaluation in this case?
>
> A     Yes, definitely.

- 3 -

Q    Can you tell us what you learned in the literature about trauma you believe helped you form your opinion in this case[?]

A    Yes.  Well, for example, in Battered Woman Syndrome the key here is the woman's perception that she is in imminent danger of losing her life.  This is her perception.  **Now, in Maneca's case that's exactly what she perceived.**

*Id.* at 466–67 (emphasis added).

The trial court called a sidebar and expressed its concern that defense counsel had not prepared Dr. Applegate in accordance with the court's pretrial discussions.  The court directed counsel to speak with Dr. Applegate:

THE COURT: Can you please have that discussion with her.

[Defense counsel]: Yes, I will.

THE COURT: Again.  That is inappropriate, she is going to cause a mistrial. . . . We had this discussion over and over about preparing your experts about the confines of how they could testify and I just knew when she started I could sense where we were going.  I just can't believe it.

*Id.* at 467–68.

The trial court excused the jury for lunch and then spoke in open court with Dr. Applegate.

THE COURT: . . . I think it's important for both attorneys to talk to both experts about what they may or may not testify to.

And, Dr. Applegate, I'm not trying to seem rude, you may not impinge upon the jury's role here.  You are not to tell the jury that ultimately the decisions or what they are here to decide.  So I think that you need to discuss with [defense counsel] the kind of limitations of what you can testify to here today and what expert testimony you can testify to with all due respect.

The jury is going to decide the issues here and so I'm hoping that you will -- we discussed this in advance.  I'm always concerned with experts, you know, as I'm going to instruct the jury, . . . experts are only experts because they are giving special

- 4 -

testimony. They're not experts because they're giving testimony that's to be given any[ ]more credence than any other witness. They are . . . allowed to testify to things in a manner that's different from other witnesses, things they didn't see or hear or, you know, . . . their testimony comes in differently.

But what an expert is not allowed to do is come in and impinge on decision making that's for the jury and to decide things that is for the jury to decide. And I'm concerned and I know we had this discussion coming in that we have dueling experts and they are not going to come in here and one expert is going to say she did or she didn't and she -- they both have a role here and I asked both counsel to discuss that with the experts and, Dr. Applegate, with all due respect was just about to say something that I think probably would have caused a mistrial. . . .

So, I'm going to ask you to be thoughtful about what is allowed to come in here and what isn't and please don't test me, okay. We all know what these witnesses are allowed to say and what they are not. And let's not waste the jury's time after almost four full days of testimony, okay. Let's play fair.

*Id.* at 469–71.

The ADA requested that the court reporter read back Dr. Applegate's statement. The trial court continued to express its concern:

THE COURT: That's exactly what you are not permitted to testify to.

[Dr. Applegate]: Okay.

THE COURT: That's exactly what I informed counsel they were to inform their witness not to do. I mean am I right?

[Defense counsel]: Yes, Your Honor.

THE COURT: Did you not have that discussion?

[Defense counsel]: We had a discussion.

THE COURT: Did [defense counsel] discuss that with you?

[Dr. Applegate]: Well, we discussed many things but I'm not a lawyer so I'm sure that I --

THE COURT: Dr. Applegate, you testify in Act 33 cases all the time, you do forensics.

[Dr. Applegate]: Yes.

THE COURT: Give me a break. I'm not trying to seem rude. I mean I didn't just fall off a tree and land in this chair, don't tell me that, don't give me that garbage.

*Id.* at 471–72.

The ADA asked the trial court to issue a curative instruction. The court indicated that it would do so and tell the jury "that's for you to decide and she is not allowed to testify to that." *Id.* at 472. The trial court further questioned Dr. Applegate:

THE COURT: I'm curious, did he tell you not to do that? Did [Defense counsel] specifically tell you not to do that? Do you understand the jury's role in this case?

[Dr. Applegate]: Yes, I do.

THE COURT: Do you understand that that's their decision?

[Dr. Applegate]: Yes, I do.

THE COURT: Why would you say that to the jurors? Because that is actually what they are deciding.

[Dr. Applegate]: Can I ask a question to clarify in my mind?

THE COURT: Yes.

[Dr. Applegate]: Maneca made statements to me which I put in my report about what she was thinking as she was going through that whole thing. And she stated, "I started to think this is it." "Are people going to find my body," this kind of statement. Is that allowed to be witness --

THE COURT: That's not what you just said. You made a conclusion and what you said was, "people who suffer from Battered Woman Syndrome believe that they are going to die and need to use deadly force. That's exactly what she believes."

*Id.* at 473–74 (quotation marks added).

The trial court had an extended discussion with counsel and Dr. Applegate about the applicability of BWS to Pressley's case. Before recessing for a brief lunch, the trial court reiterated that it would give a curative instruction:

> THE COURT: . . . I'm going to end up having to instruct the jury that they are to disregard [Dr. Applegate's statement]; that other witnesses are not to tell them what anyone else is -- I am going to ask you to tell what that was so I can figure out exactly how I am going to say it and then I am going to explain to you what I'm going to tell them, that is improper and I'm going to tell them that's their decision.

*Id.* at 487.

After lunch, still outside the presence of the jury, the trial court continued its questioning of Dr. Applegate, discussed the possibility of a curative instruction, and then declared a mistrial over Pressley's objection:

> THE COURT: . . . And before we broke[,] you in fact said that you basically testified to something that actually the jury is to decide as to what the defendant's perception was and that she perceived and what her perceptions were, and that's not appropriate or that that's ultimately questions for the jury. Do you understand?
>
> [Dr. Applegate]: Yes, I do understand that, yes. Thank you.
>
> THE COURT: I'm just -- you know, I think when -- prior to the lunch break as soon as Dr. Applegate testified I was concerned because ultimately these are -- this is basically a central issue for the jury.
>
> Frankly, I don't know, we refer to witnesses as experts and I think in some level it elevates a witness to the jurors as even though we instruct them otherwise as people who are more believable even though they are instructed that that's not the case, they are just people that can testify to things that other people can't testify to. They are not necessarily -- I don't want to say smarter or more believable than other people, they are just people who can testify in a different manner than other witnesses.

- 7 -

And so we refer to them as experts because they can testify to things they didn't personally observe or they have specialized knowledge or they are going to testify differently.

When you have an expert basically testify to one of the central questions and just sat here so rocked by the fact that she did that, that I immediately -- my immediate thing was I'm like here goes, here comes the mistrial.

And I sat on it over lunch thinking to myself is there any[ ]way to cure this to the jury, can I give an instruction to the jury that's going to un-ring this bell? So, I thought I would have counsel address whether or not they think there is any instruction that's going to cure this.

[The ADA]: From the Commonwealth, I cannot think of one, Your Honor.

[Defense counsel]: The defense would object to a mistrial and request a curative instruction asking the jury to disregard Dr. Applegate's answer.

THE COURT: It wasn't an answer, was it?

[Defense counsel]: Her statement. In directing the jury to the fact that they are the sole decider of the facts and no expert or lay witness is permitted to invade the province of the jury who is the sole decider of the ultimate issues in the case.

THE COURT: Well, I honestly -- I'm struggling. I think if it had been some -- if an expert had come in here and said something off the cuff about some other extraneous issue or some ancillary issue that would be one thing. But for an expert to take the stand and basically say that the defendant -- I'm just going to say it, was basically did this and it was reasonable -- I don't know that any instruction I'm going to give is going to . . . undo this or un-ring this bell.

You know, my role here is to make sure this trial is fair for both sides, both the Commonwealth and the defense. Had Dr. Wright gotten up and said clearly what Miss Pressley did was first degree murder I would be doing the exact same thing. I couldn't un-ring that bell either and say ladies and gentlemen of the jury, I'm going to strike that. You are to disregard that. I don't think that would be anything I could cure either.

As much as I hate to do it on day four I just don't think at this point a curative instruction is going to un-ring the bell that's been rung. I just don't. And I don't think it's fair to the Commonwealth so I'm going to declare a mistrial.

*Id.* at 500–03.

After the mistrial, the case was then set for a second trial. On October 18, 2022, Pressley moved to dismiss her case based on double jeopardy. The parties filed briefs. The trial court heard argument on the motion on January 3, 2023. The court denied the motion. N.T., Motion, 1/3/23, at 9; Order, 1/3/23.

Pressley timely appealed. Pressley and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.[3]

Pressley presents the following issue for review:

Did the trial court abuse its discretion when it denied [Pressley's] motion to dismiss based on double jeopardy as there was no manifest necessity to declare a mistrial in a self-defense Battered Woman's Syndrome case wherein the trial court *sua sponte*, and over defense objection, declared a mistrial based on an erroneous understanding of [Dr. Applegate's] testimony, where the actual testimony that occurred was admissible, and where the trial court failed to adequately consider less drastic alternatives?

Pressley's Brief at 5.

The Constitutions of the United States and Pennsylvania provide that no person shall "be twice put in jeopardy of life or limb" for the same offense. U.S. Const., amend. V; Pa. Const., Art. I § 10. When a trial court declares a

---

[3] We have jurisdiction. Pa.R.A.P. 313; *see **Commonwealth v. Gross***, 232 A.3d 819, 833 (Pa. Super. 2020) (*en banc*) ("[A]n order denying a double jeopardy motion, which makes no finding that the motion is frivolous, is a collateral order under Rule 313 [and is] immediately appealable.").

mistrial *sua sponte*, the prosecution may not retry the defendant, unless a "manifest necessity" existed for the mistrial. *Commonwealth v. Diehl*, 615 A.2d 690, 691 (Pa. 1992) (citing *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824)).[4] Our procedural rules incorporate this protection; when a defendant has not moved for a mistrial, "the trial judge may declare a mistrial only for reasons of manifest necessity." Pa.R.Crim.P. 605(B).

The manifest necessity required to avoid a double jeopardy violation is a "high degree" of necessity. *Arizona v. Washington*, 434 U.S. 497, 506 (1978). It "exists 'only where the incident [giving rise to the mistrial] is of such a nature that its unavoidable effect is to deprive [a party] of a fair trial by preventing the jury from weighing and rendering a true verdict.'" *Commonwealth v. Goods*, 265 A.3d 662, 665 (Pa. Super. 2021) (quoting

---

[4] Justice Story wrote for the Court:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.

*Perez*, 22 U.S. at 580.

It is plausible to read the final clause to allow a mistrial *sua sponte* based only on "the ends of public justice," even without a manifest necessity. *See, e.g.*, *Commonwealth v. Stewart*, 317 A.2d 616, 618–19 (Pa. 1974). However, subsequent Supreme Court pronouncements illustrate that this clause merely justifies manifest necessity as an exception to an absolute bar of a retrial. *See Richardson v. United States*, 468 U.S. 317, 323–24 (1984) (reading "or" as "because"). In practice, it is unusual to find that the ends of public justice require a mistrial without also finding manifest necessity. *See Illinois v. Somerville*, 410 U.S. 458, 459 (1973) (holding that manifest necessity was shown based on the ends of public justice).

*Commonwealth v. Cash*, 137 A.3d 1262, 1273 (Pa. 2016)). Because a defendant has a substantial interest in having the first empaneled jury render a decision, any doubt as to the existence of manifest necessity is resolved in favor of the defendant. *Commonwealth v. Walker*, 954 A.2d 1249, 1254–55 (Pa. Super. 2008) (*en banc*) (citations omitted).

In reviewing a trial court's mistrial ruling, this Court must determine whether the trial court abused its discretion in finding manifest necessity. *Id.* at 1255. In doing so, we recognize that there is no "mechanical formula" that can be applied across the "varying and often unique situations" that may occur in a criminal trial. *Id.* However, "before deciding whether a mistrial is necessary, the court must discern whether misconduct or prejudicial error actually occurred." *Goods*, 265 A.3d at 665 (internal quotation marks and citation omitted). Further, there is no manifest necessity for a mistrial "where cautionary instructions are adequate to overcome prejudice." *Id.*

Although a mistrial may arise from the presentation of evidence, "the soundness of the trial court's evidentiary rulings" is not the main issue for review. *Walker*, 954 A.2d at 1255. A reviewing court will "follow the logic" of the rulings on evidence in determining whether manifest necessity existed. *Id.*; *cf. Ramirez v. Debs-Elias*, 407 F.3d 444, 447 (1st Cir. 2005) (assuming that a defendant's evidence was inadmissible, for the manifest necessity analysis, where the defendant did not argue otherwise).[5] However, where

---

[5] In analyzing manifest necessity, we consider standards from both federal and state cases. *Commonwealth v. Diehl*, 615 A.2d 690, 691 (Pa. 1992).

evidence is admissible under applicable law, the admission of that evidence does not create a manifest necessity for a mistrial, even if the trial court ruled to exclude it. **See Taylor v. Dawson**, 888 F.2d 1124, 1132–33 (6th Cir. 1989) (holding that no manifest necessity for a mistrial arose from admitting the decedent's prior acts of violence, where any ruling to exclude them would have been inconsistent with state law). Further, a potential remedy, short of a mistrial, for the admission of evidence without an adequate foundation is to allow the proponent of the evidence to lay a foundation. **Gilliam v. Foster**, 75 F.3d 881, 895–901 (4th Cir. 1996) (*en banc*); **United States v. Bates**, 917 F.2d 388, 397 (9th Cir. 1990).

We thus turn to the legal treatment of Battered Woman Syndrome and the use of expert testimony. In Pennsylvania, "where a pattern of battering has been shown, [BWS] must be presented to the jury through the introduction of relevant evidence." **Commonwealth v. Stonehouse**, 555 A.2d 772, 785 (Pa. 1989) (opinion announcing the judgment of the court).[6] Under this rule, in an appropriate case, trial counsel could be ineffective for failing to present expert evidence of BWS. **See id.**

This Court has further explained that "expert testimony regarding" BWS "is admissible as probative evidence of the defendant's state of mind as it relates to a theory of self-defense." **Commonwealth v. Miller**, 634 A.2d

---

[6] Three Justices joined the lead opinion in **Stonehouse**. The other four found that the BWS issue was not properly before the court. **Commonwealth v. Stonehouse**, 555 A.2d 772, 785 (Pa. 1989) (Zappala, J., concurring, with Flaherty, J.); **id.** at 785–86 (Nix, C.J., dissenting, with McDermott, J.).

614, 621–22 (Pa. Super. 1993) (*en banc*). BWS is not a defense itself; rather, it fits within the established law of self-defense. ***Id.*** at 622. In a case with a history of the victim abusing the defendant, BWS evidence is relevant to explain the defendant's state of mind at the time she used force. ***Id.*** at 622. Notably, expert testimony on BWS "is not introduced to improperly bolster the credibility of the defendant, but rather, to aid the jury in evaluating the defendant's behavior and state of mind given the abusive environment which existed." ***Id.***

An expert opinion on BWS, like opinion testimony about any condition, is admissible if "it embraces an ultimate issue," even if that issue is "whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or a defense." Pa.R.E. 704 and *Comment* (distinguishing F.R.E. 704(b)). "Psychiatric testimony has long been held admissible to prove a defendant's subjective belief that he or she is in danger of imminent death or serious bodily injury." ***Commonwealth v. Pitts***, 740 A.2d 726, 734 (Pa. Super. 1999) (citations omitted). An expert can testify to a defendant's ***subjective belief*** but not to whether that belief is ***objectively reasonable***. ***Commonwealth v. Light***, 326 A.2d 288, 292 (Pa. 1974) (holding that psychiatric testimony is admissible to the defendant's "honest, *bona fide* belief that he was in imminent danger" but not relevant to whether that "belief [is] reasonable in light of the facts as they appeared to him").

A related, yet distinct, limitation is that an expert may not give an opinion about whether another witness is telling the truth or is credible. ***E.g.***,

- 13 -

*Commonwealth v. Seese*, 517 A.2d 920 (Pa. 1986). This is because credibility determinations are exclusively the province of the jury. *Commonwealth v. Gallagher*, 547 A.2d 355, 357 (Pa. 1988) (collecting cases). However, just because relevant expert testimony corroborates the testimony of another witness does not render that testimony inadmissible. *Commonwealth v. Baldwin*, 502 A.2d 253, 257 (Pa. Super. 1985) ("The fact that the jury, if it believes the expert's testimony, may draw inferences which would tend to bolster the victim's credibility does not make the evidence inadmissible. It is a commonplace fact that the testimony of one witness may tend to corroborate another.").

We thus turn to the facts of Pressley's case. The testimony at issue was delivered after the court directed counsel to "restrain it to the applicability to this case, to the extent that it would again inform and educate the jury in their assessment of this case." N.T., Trial, 4/25/22–4/28/22, at 466. Dr. Applegate testified:

> Q    Can you tell us what you learned in the literature about trauma you believe helped you form your opinion in this case[?]
>
> A    Yes. Well, for example, in Battered Woman Syndrome the key here is the woman's perception that she is in imminent danger of losing her life. This is her perception. **Now, in Maneca's case that's exactly what she perceived.**

*Id.* at 467 (emphasis added).

The trial court reasoned that the emphasized portion above ran contrary to its pretrial ruling and infringed on the jury's role as fact-finder. While the underlying evidentiary ruling is not the main issue on appeal, Pressley has

sufficiently addressed this issue in her brief, such that we may review it as part of our analysis of the trial court's ultimate determination of manifest necessity for a mistrial. **See Walker**, 954 A.2d at 1255. Pressley argues that Dr. Applegate's statement was admissible under applicable law about BWS evidence and expert testimony. [7] We agree.

Pressley herself testified that Walker had abused her for months during their relationship, rendering expert testimony on BWS relevant in her case. **Stonehouse**, 555 A.2d at 785. Therefore, Dr. Applegate could testify to Pressley's "state of mind as it relates to a theory of self-defense." **Miller**, 634 A.2d at 622. Specifically, Dr. Applegate could recount her findings about Pressley's subjective mental state: Pressley perceived she was in imminent danger of death. **Pitts**, **supra**; **Light**, **supra**.[8] Although this was one of the main issues before the jury, the testimony was not inadmissible for that reason. Pa.R.E. 704. And while Dr. Applegate's statement would tend to corroborate Pressley's testimony, mere corroboration does not infringe on the jury's ability to judge Pressley's credibility that she thought she was going to die. **Baldwin**, **supra**. As such, Dr. Applegate's statement was admissible under Pennsylvania law.

---

[7] *Amicus curiae* National Defense Center for Criminalized Survivors at the Battered Women's Justice Project gives a similar argument about the pretrial ruling, as well as an analysis of the ends of public justice.

[8] If Dr. Applegate had testified that Pressley "did this and it was reasonable," N.T., Trial, 4/25/22–4/28/22, at 502, this would have run afoul of **Light**. However, Dr. Applegate did not state that Pressley's subjective belief was objectively reasonable.

On the evidentiary issue, the Commonwealth reaches the same conclusion as the trial court, but through a slightly different approach. According to the Commonwealth, Dr. Applegate's statement about Pressley's belief was not admissible as an opinion because it was presented without any of the facts that led her to that conclusion. However, there was a lesser alternative to a mistrial if the Commonwealth or the trial court had been dissatisfied with the basis for Dr. Applegate's opinions. The trial court could have directed Pressley's counsel to lay a foundation, which would have allowed Dr. Applegate to testify to her clinical evaluation of Pressley and review of Pressley's records. *Gilliam*, *supra*; *Bates*, *supra*.

Given that Dr. Applegate provided an opinion about Pressley's subjective mental state, we cannot find that "misconduct or prejudicial error actually occurred," as would cause manifest necessity for a mistrial. *Goods*, 265 A.3d at 665. Indeed, because Dr. Applegate's opinion was relevant and admissible, this weighs against manifest necessity. *Taylor*, *supra*. And although the trial court took many steps consistent with sound discretion—questioning Dr. Applegate and counsel outside the presence of the jury, considering the issue over lunch, and addressing a curative instruction—this does not guarantee that its analysis comported with the law. *Walker*, 954 A.2d at 1255. Instead, it appears that despite these efforts, the trial court misapplied the law, and thus abused its discretion, when it declared a mistrial here. We therefore reverse the order denying Pressley's motion for dismissal based on double jeopardy, and we discharge Pressley.

Order reversed. Appellant discharged.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/6/2023